IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| FRANK M. DARDEN,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>COST MANAGEMENT SERVICES, INC.,<br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br><br>Case No. 2:06-CV-00975 CW |

## INTRODUCTION

Consultant Frank M. Darden ("Darden") contracted with Cost Management Services ("CMS") to market Medicaid reimbursement programs to school districts in various states. Darden successfully marketed the reimbursement program in Utah, but did not have the same success in Louisiana. Darden is seeking partial summary judgment for CMS' alleged failure to pay him for services he provided in Utah. The sole issue of Darden's motion is "whether the State of Utah was a 'stand alone' state within which Darden would get reimbursement, regardless of the performance in other states, or whether Utah must be taken as an aggregate of all states before monies are paid to Darden."[1] In turn, CMS seeks judgment and dismissal of all of Darden's claims based on (1) indefiniteness, (2) abandonment, and (3) its interpretation of the contract at issue (the "Contract")

---

[1] Motion for Partial Summary Judgment, ¶ 4 (Docket No. 37).

that the calculation of "net fees" pertains to the total fees earned under the Contract rather than fees earned on a state-by-state basis.

The court finds that the language of the Contract is ambiguous because it is reasonably susceptible to two interpretations.  Material issues of fact exist regarding the parties' intent.   The parties' cross-motions on the issue of contract interpretation are therefore denied.  Although the Contract is ambiguous, the court holds that it contains sufficient detail to show it is not indefinite. CMS' motions for summary judgment on this issue is denied.  CMS' argument that Darden abandoned the Contract involves materially disputed facts.  Accordingly, summary judgment on this ground is likewise denied.

## BACKGROUND FACTS

Medicaid is a program funded by the individual states and partly by the federal government. In 1999, CMS entered into a contract with Zions First National Bank ("Zions Bank") where CMS agreed to market and provide Administrative Outreach and Medicaid Fee-for-Service programs to school districts in various states, including Utah.  For each contract CMS secured from a school district, Zions Bank agreed to pay CMS fifty percent of the net revenue for its work.

Darden is a consultant who markets Medicaid cost-reimbursement programs to school districts in various states.  Rather than CMS performing the marketing portion of its contract with Zions Bank, it retained Darden to do that work.  Darden had previously been retained by CMS and others to perform similar work, but the Contract at issue between CMS and Darden is different than the typical form contract Darden uses for his work because it is a contingent-fee arrangement.  The key language in the Contract is as follows:

> Darden and Associates shall receive from Cost Management Services or its subsidiaries 25% of the net fees received from Medicaid reimbursements under this contract.  Net fees are defined as gross receipts minus direct job related costs and reasonable overhead.[2]

The Contract also states that Darden is to "Market Medicaid reimbursement to states identified on the attached list as well as other states identified in the future . . . ."[3]  The list outlines the "Status of Existing Projects" in eighteen different states.  For Utah, it states that "A contract has been signed and the project is going forward with Zions Bank."[4]

At the time Darden entered into the Contract with CMS, he also worked as a marketing director and officer of Zions Bank.  Darden had proposed to Zions Bank that it become involved in Medicaid reimbursement projects.[5]  Because Darden had proposed the idea, Zions Bank agreed to pay Darden "10% of the net revenues received by the Public Financial Services Group, for the base period covered by the respective contracts with the school districts."[6]  Zions Bank and CMS assert that they were unaware that each was paying Darden for his services, although Zions Bank acknowledges that it knew Darden had contracts with other entities.[7]

---

[2]  Contract, ¶ 1 (Docket No. 37, Ex. A).

[3]  *Id.* ¶ A.

[4]  *Id.*, Status of Existing Projects.

[5]  Letter, dated June 15, 1999 (Docket No. 46, Ex. 9).

[6]  *Id.* Zions Bank divided profits from the CMS/Zions Bank contract with different divisions at the bank.  The Public Financial Services Group is one of the divisions that received a portion of the profits.  Darden received ten percent of that portion.  Robert B. Howell Depo. 26:3–15 (Docket No. 46, Ex. 1C).

[7]  Howell Depo. 68:2–9 (Docket No. 46, Ex. 1C).

3

After Darden entered the Contract with CMS, he successfully marketed the Medicaid reimbursement project in Utah. This resulted in CMS having agreements with most school districts in the state to perform administrative outreach services. Both Zions Bank and CMS realized a profit on these agreements. Darden also marketed the project in Louisiana, but CMS suffered losses in that state. Darden has demanded that CMS pay him his twenty-five percent share of the net profits from the Utah project. CMS has refused, claiming that the "net fees" to be paid is to be calculated on the total fees earned under the Contract, rather than net fees earned on a state-by-state basis. Because CMS suffered losses in Louisiana, CMS believes those losses cancel out the gain it received in Utah. Consequently, CMS contends that Darden is not entitled to any fees for his work.

Darden filed suit against CMS for breach of contract, an accounting, and unjust enrichment. In turn, CMS filed a counterclaim seeking payment for lost profits in Louisiana because Darden allegedly refused to continue his marketing efforts in that state. CMS also seeks reimbursement for expenses already paid to Darden and recoupment of any payments Darden may have received from third parties. The instant action addresses (1) Darden's motion for partial summary judgment on the sole issue of whether Utah was a "stand alone" project or whether the Utah project must be considered in the aggregate of all states for compensation purposes, and (2) CMS' motion for summary judgment based on indefiniteness, contract interpretation, and abandonment.

## ANALYSIS

### I.   LEGAL STANDARD

Both parties assert the Contract is unambiguous and should be interpreted as a matter of law. Under Utah law,[8] the Utah Supreme Court has clarified that there are two types of contract

---

[8]   Darden is a citizen of Florida and the Contract was signed in Florida. CMS is a Pennsylvania corporation. Both parties nevertheless contend that Utah law applies. Because the

4

ambiguity:  "(1) facial ambiguity with regard to the language of the contract and (2) ambiguity with regard to the intent of the contracting parties."[9] Facial ambiguity "presents a question of law to be determined by the judge."[10]  In contrast, ambiguity regarding intent of the parties "presents a question of fact where, if the judge determines that the contract is facially ambiguous, parol evidence of the parties intentions should be admitted."[11]  "Thus, before permitting recourse to parol evidence," for purposes of showing the intent of the parties, "a court must make a determination of facial ambiguity."[12]

Although facial ambiguity presents a question of law, the judge must consider "any relevant evidence."[13]  "Otherwise, the determination of ambiguity is inherently one-sided, namely, it is based solely on the extrinsic evidence of the judge's own linguistic education and experience."[14]  Once "a judge considers relevant and credible evidence of contrary interpretations, the judge must ensure that the interpretations contended for are reasonably supported by the language of the contract."[15]  When making this determination, the court reads the contract as a whole and does not read its provisions

---

Contract was performed in Utah and Darden is suing to collect fees generated from the Utah project, Utah arguably "has the most significant relationship to the transaction."  *Morris v. Health Net of Cal., Inc.*, 1999 UT 95, ¶ 8, 988 P.2d 940.  In such instances, Utah law applies.  *Id.*

[9]  *Daines v. Vincent & ASC Group*, 2008 UT 51, ¶ 25, 190 P.3d 1260 (citations omitted).

[10]  *Id.* (citing *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139).

[11]  *Id.* (quoting *Winegar v. Froerer*, 813 P.2d 104, 108 (Utah 1991)) (quotations and citations omitted).

[12]  *Id.* (citations omitted).

[13]  *Id.* ¶ 26.

[14]  *Id.* (quotations and citations omitted).

[15]  *Id.*

in isolation.[16]  If the contract is susceptible to two reasonable interpretations based on extrinsic

evidence and the language of the contract, then ambiguity exists regarding the parties' intent.[17]  If

such ambiguity exists, the intent of the parties must be determined by a fact finder, and summary

judgment is inappropriate.

## II.    CONTRACT INTERPRETATION

As stated earlier, the parties dispute what the following language from the Contract means:

> Darden and Associates shall receive from Cost Management Services
> or its subsidiaries 25% of the net fees received from Medicaid
> reimbursements under this contract.  Net fees are defined as gross
> receipts minus direct job related costs and reasonable overhead.[18]

Darden contends that the language refers to payment for each project on a state-by-state basis.  CMS

contends it means payment after proceeds from every state are received because the contract was one

global project.  While the Contract specifies the percentage of net fees that Darden will receive and

defines net fees, the language does not address whether "direct job related costs" means one global

job or individual jobs.

### A.    Language of the Contract

Darden argues that the Contract language defining "net fees" as "gross receipts minus direct

job related costs and reasonable overhead" allows only an interpretation that payment is to be made

state-by-state.  Otherwise, Darden argues, the reference would be "jobs" plural, rather than to the

singular "job."  The problem with this argument is that "job" is used as an adjective modifying

---

[16]  *See Cyrus Amax Minerals Co*., 74 P.3d at 299 (quoting *Underwriters* at *8)*.

[17]  *See Daines*, 2008 UT 51, ¶ 25.

[18]  Contract, ¶ 1 (Docket No. 37, Ex. A).

"costs" – it informs about the kind of costs, but not necessarily about whether costs from more than one state should be included.  Moreover, it would be non-idiomatic to use a plural "jobs" as an adjective in this phrase.  The use of the phrase "direct jobs related costs" would be unusual phraseology even if the parties intended to include costs of all the state projects in the calculation.  The most relevant phrase in the Contract simply does not inform as to the parties' intent on this issue.

Reading the Contract as a whole, it contains a list regarding the "Status of Existing Projects."  Each state is listed individually, and the status of that state project is reported.  Thus, the Contract addresses individual projects rather than one global project.  Darden contends this shows reimbursement also was to be paid state-by-state.  The court disagrees that the Contract can, as a matter of law, be so interpreted.  The projects are listed at varying stages of completion.  It is not unusual, therefore, that they would be listed individually rather than globally.  Thus, merely listing a state's status individually does not inform the court whether Darden was supposed to be paid on a state-by-state basis.

Although the list of projects does not unambiguously show payment was to be made state-by-state, neither does it clearly dictate that CMS' interpretation should be accepted.  For CMS' interpretation to be correct, the court would have to accept that during the parties' negotiations, Darden agreed not to be paid for his work until the projects from eighteen different states were completed.  Only then would the net proceeds from the global project be known.  Given the number of states involved and the length of some of the contracts, CMS' interpretation would potentially require Darden to wait years before he would know whether he would receive any compensation.  Moreover, the Contract allows for additional states to be "identified in the future," thus, possibly

7

extending payment indefinitely.  Although such an interpretation seems somewhat unlikely, it is not implausible.  Individuals often have to wait many years before a contingent fee project is resolved and they know whether they will be compensated.  This risk is negotiated into the terms of such contracts.  While logic and common sense would suggest that Darden expected to be paid as each state effort was concluded and income received, nothing in the Contract makes it clear, as a matter of law, that the parties both had that intent.

### B.    Zions Bank Contract

Darden further points to the contract between Zions Bank and CMS to support his contention that his Contract with CMS was not a contingent fee contract.  Under the Zions Bank contract, CMS received payment on a state-by-state basis.[19]  While Darden was not a party to that contract, his payments were derived from the profits that CMS received under the Zions Bank contract.  Consequently, Darden contends the contracts should be harmonized and read as one contract.

"When parties have reduced to writing what appears to be a complete and certain agreement, it will be conclusively presumed, in the absence of fraud, that the writing contains the whole of the agreement between the parties."[20]  The Zions Bank contract appears to be a complete and certain agreement.  It does not specify how Darden will be paid.  Indeed, Darden was not a party to the Zions Bank contract, and he admits he never saw it prior to this lawsuit.  The court therefore concludes the two documents are separate contracts and, on the record now before this court, finds no basis to read and construe the contracts together.

---

[19]  Mot. for Partial Sum. Jdgmt., Ex. B, 3 (Docket No. 37).

[20]  *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 12, 182 P.3d 326 (citing *Bullfrog Marina, Inc. v. Lentz*, 501 P.2d 266, 270 (Utah 1972)).

###### C.       Other Extrinsic Evidence

The parties also cite to e-mails to show the meaning of the Contract.  In September 2003, Darden asked CMS if it could project "when we will have cash flow out of Utah."[21]  In October 2003, Darden informed CMS that he was working on a business profit and loss statement, and that he "wanted to plug Utah in somewhere."[22]  He asked CMS to estimate when reimbursements would resume in Utah.  He then stated:  "do you think it will be years or months before there will be any profit out of Louisiana.  Should I not include any predictions for Louisiana?"[23]  Later that month, Darden said "Regarding Louisiana, with the downfall of cash flow from Utah, I can no longer agree to work for food."[24]

Darden asked about the reimbursement from each state separately.  When profits were not coming in from Utah, he indicated he could not continue working on the Louisiana project "for food."  If the parties had agreed that Darden would not be paid until the end of the project, whether Utah was bringing in a profit would not have impacted his efforts in Louisiana.  The e-mails arguably support that the parties agreed Darden would be paid on a state-by-state basis.

Additionally, Darden testified during deposition that "the words 'direct job related' were very critical" to him,[25] and that he never would accept a contract where the costs of one state were

---

[21]  E-mail from Darden to John Mahoney, Sept. 30, 2003 (Docket No. 41, Ex. 8.)

[22]  E-mail from Frank Darden to John Mahoney, October 2003 (Docket No. 41, Ex. 8).

[23]  *Id.*

[24]  E-mail from Frank Darden to John Mahoney, October 27, 2003 (Docket No. 41, Ex. 8).

[25]  Deposition of Frank Darden, 74:20–21 (Apr. 16, 2008) (Docket No. 45).

deducted from the costs of another due to "the nature of the business."[26]  Additionally, Darden testified that James Durkin ("Durkin"), CMS' President, told Darden that he would make more money under the contract and he would be paid over time like an annuity.[27]  He further testified that Durkin and he discussed that "[e]ach state is separate and each state would be its own direct cost, its own project."[28]  Darden stated he remembered the discussion well because the Contract contained new language and they went over it multiple times.[29]  Ultimately though, Darden testified he "would never agree to other projects being deducted from this one or any other one because you can't control those other projects."[30]

In contrast, however, Durkin testified during deposition, "[t]he discussions I had with Frank were that we weren't going to try to include anything that didn't apply to his projects, but that we would group the projects."[31]  He further testified that when CMS received money from the Utah project, they paid some money to Darden, but told him "we're not netting anything out of this" because they had not had time to reconcile the other accounts.[32]  On the second or third payment, however, they started to reconcile expenses and deduct them from the Utah profits.[33]  Durkin testified they did it this way because "Frank was looking for money, needed money, and we said

---

[26]  *Id.* at 75:9–14.

[27]  *Id.* at 80:22–81:4.

[28]  *Id.* at 81:17–19.

[29]  *Id.* at 82:20–22.

[30]  *Id.* at 83:1–3.

[31]  Deposition of James Durkin, 184:14–17 (June 18, 2008) (Docket No. 39).

[32]  *Id.* at 138:2–6.

[33]  *See id.* at 138:9–24; 158:8–12.

okay, we'll send you the check and we'll reconcile it later."[34]  This testimony about the parties' discussions and their course of dealing contradicts Darden's testimony, yet, it is plausible.

Because the parties present contradictory evidence about the meaning of the Contract, and the Contract is reasonably susceptible to both interpretations proffered by the parties, the court concludes the Contract is ambiguous and the parties' intent cannot be resolved as a matter of law. Accordingly, the parties' cross-motions for summary judgment on the issue of the Contract's interpretation are denied.

## III.    OTHER ISSUES

### A.    Indefiniteness

CMS further contends that the agreement between Darden and CMS does not constitute a legal contract because the parties did not have a meeting of the minds about essential contract terms. Consequently, CMS argues the Contract is uncertain and indefinite.  "A condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced."[35]  Under Utah law, "the essential elements of a contract include 'offer and acceptance, competent parties, and consideration.'"[36]  When a contract "provide[s] a basis for determining the existence of a breach and determining an appropriate remedy" the contract typically has sufficient definiteness and certainty.[37]

---

[34]  *Id.* at 159:7–9.

[35]  *Valcarce v. Bitters*, 362 P.2d 427, 428 (Utah 1961) (quotations and other citations omitted).

[36]  *Uhrhahn Constr. & Design, Inc. v. Hopkins*, 2008 UT App. 41, ¶ 12, 179 P.3d 808 (quoting *Golden Key Realty, Inc. v. Mantas*, 699 P.2d 730, 732 (Utah 1985)); *Heidiman v. Washington City*, 2007 UT App 11, ¶ 25, 155 P.3d 900.

[37]  *Goodman v. Cisco Sys., Inc.*, 148 Fed. Appx. 378, 382 (6th Cir. 2005) (citation omitted).

Although the court has concluded the Contract is ambiguous, once the fact-finder determines the parties' intent, the Contract is sufficiently definite to be enforced. The Contract includes such details as the identity of the parties involved, the scope of the work and the amount of reimbursement.[38] The Contract states the specific percentage of net fees that Darden would receive and it provides a definition for what constitutes "net fees."[39] Moreover, both parties signed the Contract, Darden performed, and CMS accepted that performance. While the Contract is not the best example of how a contract should be drafted, when viewed in totality, it provides sufficient detail to demonstrate that the parties had a meeting of the minds. Merely because CMS and Darden now contend for opposite interpretations of the Contract does not alter this fact. CMS' motion for summary judgment on this ground is also denied.

**B.      Abandonment**

CMS claims Darden intentionally relinquished his right to the Contract when he refused to perform further work in Louisiana on a contingent-fee basis. No money was coming in from Utah because all reimbursements were frozen pending review by the federal government. Louisiana's prospects were poor, and the parties were not optimistic that they could get in front of the right people to discuss the projects. Despite these circumstances, Darden contends he did return to Louisiana, and would have continued to help had the parties not mutually agreed there was nothing more for him to do. The extrinsic evidence puts a material fact in dispute regarding whether Darden failed to perform in Louisiana. As a result, CMS is not entitled to summary judgment on the basis of abandonment and this issue remains for trial.

---

[38] Contract, Docket No. 37.

[39] *Id.* at ¶ 4.

12

## **ORDER**

For the reasons stated above the court ORDERS as follows:

Plaintiff's motion for partial summary judgment is DENIED.[40]

Defendant's motion for summary judgment is DENIED.[41]

DATED this 21st day of August, 2009.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[40] Docket No. 37.

[41] Docket No. 40.